United States District Court
Middle District of Florida
Jacksonville Division

**KEITH HARTLEY,**

   *Plaintiff,*

v.            **NO. 3:16-CV-643-J-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

   *Defendant.*

---

## Order Reversing Commissioner's Decision

This is a case under 42 U.S.C. § 405(g) and 1383(c)(3) to review a final decision of the Commissioner of Social Security denying Keith Hartley's claim for disability insurance benefits and supplemental security income.[1] He seeks reversal, Doc. 11; the Commissioner, affirmance, Doc. 13.

## Background

Hartley was born in 1962 and last worked in 2011. Tr. 202, 210, 229. He has a high-school education and experience as a local-delivery driver and a long-haul truck driver. Tr. 230. He alleged he had become disabled in September 2011 from asthma, lung problems, heart problems, left eye problems, leg problems, high blood pressure, sleep apnea, sinusitis, and gout. Tr. 224, 229. Later, he added that in October or December 2012, he was diagnosed as bipolar and schizophrenic, could not focus, hallucinated, and started hearing voices. Tr. 256, 264. He is insured through 2016.

---

[1] 42 U.S.C. § 405(g) provides federal district court jurisdiction over final agency decisions concerning disability insurance benefits. 42 U.S.C. § 1383(c)(3) incorporates § 405(g) for final agency decisions concerning supplemental security income.

Tr. 217. He proceeded through the administrative process, failing at each level. Tr. 1–7, 18–39, 133–43, 149–58. This case followed. Doc. 1.

## Issue

Hartley presents one issue: whether the Appeals Council erred by denying his request for review of the Administrative Law Judge's ("ALJ's") decision in light of newly submitted evidence.

## Evidence Before the ALJ

On an August 2012 questionnaire, Hartley reported the following. His condition began bothering him in 2003. Tr. 253. He lost his job as a truck driver because he had an asthma attack, blacked out, and ran off the road into the bushes. Tr. 253. When asked to mark or list his conditions, he indicated he suffers severe fatigue, shortness of breath, chest pain, leg pain, digestion problems, and lung problems. Tr. 253. He sleeps four to eight hours a night but sometimes stays up all night and naps five to six hours during the day. Tr. 253. He can care for his personal needs as long as he does not stand too long. Tr. 254. He lives with his sister and sometimes helps with chores but stops when he gets short of breath and his chest and legs start to hurt. Tr. 254. He "do[es] good" in church but can no longer sing in the choir and likes to bowl but no longer can. Tr. 254.

Many medical records from Hartley's treatment for breathing problems contain notations of normal psychological status. *See, e.g.* Tr. 355 (no anxiety, depression, and sleep disturbances), 398 (oriented to time, person, and place; normal speech and content; appropriate mood and affect; interactive and responsive; intact memory, judgment, and insight), 436 (normal mood and affect), 442 (no confusion), 445 (normal mood, affect, behavior, judgment, and thought content), 529 (normal mood, affect, behavior, judgment, and thought content), 687 (normal mood, affect, speech, behavior, judgment, thought content, cognition, and memory), 693 (no signs of anxiety, depression, or suicidal intention), 695 (no signs of anxiety, depression, or

suicidal intention), 723 (normal mood, affect, behavior, judgment, and thought content), 729 (no psychosis; good judgment, memory, and behavior), 731 (no psychosis; good judgment, memory, and behavior).

In October 2012, Hartley was admitted to the hospital for shortness of breath, wheezing, and coughing. Tr. 630. William Hunt, III, M.D., performed a psychiatry consultation to evaluate Hartley's depression and suicidal ideation. Tr. 637. Dr. Hunt noted Hartley's mental status was within normal limits except for a moderately depressed mood, and he displayed a broad range of affect and fair to good judgment and insight. Tr. 637. Hartley reported no current perceptual distortions but a history of hearing voices, symptoms of depression, and post-traumatic stress disorder ("PTSD"). Tr. 637. Dr. Hunt opined Hartley had experienced a single episode of major depression, was not actively suicidal, and had chronic PTSD. Tr. 637. He recommended psychoeducational psychotherapy and involvement in church and prescribed medication for the depression and PTSD. Tr. 637.

In December 2012, Hartley was admitted to the hospital for exacerbation of his asthma. Tr. 600. Eduardo Sanchez, M.D., performed a psychiatry consultation. Tr. 600–01. Dr. Sanchez noted Hartley had experienced persistent auditory hallucinations telling him to hurt himself and others, including telling him to run over a person in front of him while he was driving a truck. Tr. 600. He observed Hartley was "agreeable and apparently in control of himself" but required antipsychotic medication. Tr. 600. A mental status exam showed Hartley was alert, well-oriented, had no cognitive deficits or memory defects, and displayed no evidence of a formal thinking disorder but was depressed and had suicidal command hallucinations. Tr. 600. Dr. Sanchez diagnosed Hartley with psychotic depression, opined Hartley was a danger to himself, and stated he would initiate a Baker Act to admit Hartley to an inpatient psychiatric facility. Tr. 600; *accord* Tr. 606.

Hartley received inpatient psychiatric care for three days for depression and suicidal thoughts. Tr. 654–63. Mohammad Farooque, M.D., Ph.D., documented that

Hartley had been hearing voices since 1993 but had received only outpatient care. Tr. 659. A mental status examination showed the following. He had good eye contact, poor grooming and hygiene, flat affect, apathetic mood, and limited insight and judgment; was alert and oriented to person, place, time, and situation; reported auditory hallucinations and paranoia; had alogia (inability to speak due to mental deficiency or confusion),[2] and appeared to have bradyphrenia (slowness of thought). Tr. 660. Dr. Farooque diagnosed him with "psychosis, not otherwise specified, rule out schizophrenia, paranoid type," assigned a Global Assessment of Functioning ("GAF") scale rating of around 40,[3] and prescribed antipsychotic medication. Tr. 660. In a discharge summary, Dr. Farooque repeated that diagnosis and GAF scale rating and stated Hartley had improved with treatment, was alert and oriented, and denied suicidal or homicidal ideation. Tr. 654.

In April 2013, Hartley underwent an initial psychiatric assessment with Julie Ozan, PA-C (a physician's assistant). Tr. 755–58. His chief complaint was hearing voices, and he reported auditory and visual hallucinations "as far back as he can recall," cutting his fingertips when pressured by negative voices, sad mood, low energy, crying spells, decreased appetite, worries and anxieties, passive suicidal thoughts, passive thoughts of harming others, a tendency to self-isolate because of hallucinations, and sedation from his medications. Tr. 755. He denied episodes of violence, prolonged periods of sleeplessness, spending sprees, or impulsive risk-

---

[2]All parenthetical definitions of medical terms are from Stedman's Medical Dictionary (William R. Hensyl et al. eds., 25th ed. 1990).

[3]The former version of American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV"), includes the GAF scale used by mental-health practitioners to report "the clinician's judgment of the individual's overall level of functioning" and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." DSM-IV at 32−34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id.* A GAF scale rating of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.*

taking behaviors. Tr. 755. Ozan noted he had had two psychiatric inpatient hospitalizations, a poor response to Abilify, fair response to Risperidone and Trazadone, and good response to Citalopram. Tr. 755.

A mental status exam showed he was appropriately dressed and groomed, had a cooperative but initially guarded attitude, and maintained eye contact. Tr. 757. Ozan made the following observations:

> Mr. Hartley's speech was initially guarded, but more spontaneous as exam progressed. He was alert and oriented to person, place, month[,] and year. His stated mood was mildly depressed, and he had a blunted affect, with occasional appropriate smiles.
>
> Thought content was linear and goal directed. He showed no flight of ideas or disorganized thinking. There were some mild paranoid versus overly suspicious thoughts expressed.
>
> Mr. Hartley denied any current [suicidal ideation] or [homicidal ideation], but endorsed past thoughts of harming himself[,] his family[,] and strangers, with no intention of doing so. He endorsed current auditory hallucinations of commands and negative commentary, with several voices. He endorsed occasional visions as if daydreaming, sometimes ominous, but mostly random. He was not observed responding to internal stimuli during the interview.
>
> There were no abnormal involuntary movements noted on exam. He had an overweight frame, with decreased muscle tone, but a steady gait. He had no pronator drift with gait and station testing. His psychomotor activity was calm.
>
> He was able to perform serial 7s without error, but was unable to read or spell. He was able to name the current president of the United States and who was president before him. Recent and remote memory were grossly intact, and he was able to register and recall 3/3 items at 0 and 5 minutes.
>
> He was partially able to comprehend the current situation correctly, and demonstrated the ability to orient his behavior appropriately. He was partially able to understand and appreciate the risks, benefits, and alternatives for treatment, the impact of his psychiatric condition, and need for treatment. He had adequate capacity to comply with treatment recommendations. Insight and judgment were present and adequate.

> Fund of knowledge was average, with some learning challenges of illiteracy.

> He was not suicidal or acutely agitated or homicidal and did not require admission to a psychiatric hospital.

Tr. 757.

Ozan diagnosed Hartley with schizoaffective disorder, depressed type, with "[p]sychotic symptoms consistent with other psychotic disorders but with many years of function inconsistent with typical schizophrenia," assigned a GAF scale rating of 41 to 50,[4] adjusted his medication, and opined his prognosis was fair to guarded. Tr. 757–58.

In October 2013, Hartley attended a psychiatric medication management appointment with Phyliss Taylor, M.D. Tr. 762–63.[5] Dr. Taylor noted he had been hospitalized in January 2013 for psychosis, suicidal ideation, and homicidal ideation toward his family and had been hospitalized again shortly after his appointment with Ozan but had not followed up with treatment. Tr. 762. He reported auditory hallucinations, depression, suicidal ideation, trouble sleeping, two to three panic attacks each month, and PTSD flashbacks and nightmares despite taking medication. Tr. 762.

Dr. Taylor made the following observations. Hartley was appropriately dressed and groomed, cooperative, alert, and oriented to person, place, and time. Tr. 763. He had normal speech, blunted affect, depressed mood, negative mental attitude, non-future-oriented thinking, logical and coherent thought processes, and limited insight and judgment. Tr. 763. He reported auditory and visual hallucinations but no apparent delusions, suicidal or homicidal ideation, or abnormal involuntary

---

[4]A GAF scale rating of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. DSM-IV at 32–34.

[5]The treatment record from Hartley's October 2013 appointment is duplicated at pages 827 and 828 of the transcript.

movements. Tr. 763. He had retarded psychomotor activity but normal muscle strength and tone and a steady gait. Tr. 763. Dr. Taylor diagnosed him with schizoaffective disorder, depressed type, and PTSD; assigned a GAF scale rating of 41 to 50; adjusted his medications; and opined he was severely ill. Tr. 763.

On a March 2014 impairments questionnaire, a doctor marked that Hartley has depression, anxiety, schizophrenia, and other psychological factors affecting his physical condition and cannot work in even low-stress jobs. Tr. 773.

In April 2014, Hartley attended a medication management appointment with Dr. Taylor. Tr. 825–26. His chief complaint was that he was shaking and talking to himself. Tr. 825. He reported depression, fleeting suicidal ideation, nightmares, and sleeping only a couple hours a night. Tr. 825. Dr. Taylor observed he was appropriately dressed and groomed, cooperative, alert, and oriented to person, place, and time. Tr. 825. He had normal speech, blunted affect, depressed mood, logical and coherent thought process, limited insight and judgment, normal muscle strength and tone, steady gait, retarded psychomotor activity, non-future-oriented thinking, and negative mental attitude. Tr. 825. He had no apparent delusions and denied suicidal or homicidal ideation but endorsed auditory and visual hallucinations. Tr. 825.

Dr. Taylor diagnosed him with schizoaffective disorder, depressed type, and PTSD; assigned a GAF scale rating of 41 to 50; opined he was severely ill, and adjusted his medication. Tr. 825–26.

In May 2014, Hartley attended a medication management appointment with Dr. Taylor. Tr. 823–24. He denied depression, mania, panic attacks, hallucinations, delusions, nightmares, flashbacks, and sleep problems. Tr. 823. Dr. Taylor noted the following. Hartley was appropriately dressed and groomed, cooperative, alert, and oriented to person, place, and time. Tr. 823. He had normal speech, calm affect, stable mood, logical and coherent thought process, limited insight and judgment, normal muscle strength and tone, steady gait, non-future-oriented thinking, and negative

mental attitude. Tr. 823. He had no apparent delusion, no abnormal or involuntary movement, no suicide risk, and no violence risk. Tr. 823. He denied suicidal ideation, homicidal ideation, and auditory and visual hallucinations. Tr. 823.

Dr. Taylor diagnosed Hartley with schizoaffective disorder, depressed type, and PTSD; assigned a GAF scale rating of 51 to 60;[6] opined he was moderately ill; and continued his medications. Tr. 823–24.

### Hearing Testimony

At a July 2014 hearing, Hartley testified as follows.

He lives with his wife and 20-year-old son. Tr. 58. His wife does most of the cooking and cleaning. Tr. 61. Sometimes he tries to help, but when he moves around too much he gets sick and has to use a nebulizer machine. Tr. 61. In a good week, he uses the nebulizer two or three times; in a bad week, he uses it every day. Tr. 61.

He has ten grandchildren, two of whom (ages 11 and 4) he watches during the day while his daughter is at work. Tr. 58–59. He takes care of them but cannot get up and walk around much because he gets out of breath. Tr. 59–60.

He used to drive trucks, but his asthma doctor told him he should stop because he "can't do [anything] without Prednisone." Tr. 53–54. In 2011, he had an asthma attack while driving a truck. Tr. 57–58. He became short of breath and, because he was taking too much Prednisone and was alone, he panicked, passed out at the wheel, and hit a telephone pole. Tr. 63–64. He no longer has his commercial driver's license. Tr. 64. In 2012, he was in the hospital for a week or two every month because of breathing problems. Tr. 55.

---

[6] A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV at 32–34.

He used to see Ozan for his mental conditions but now sees Dr. Taylor. Tr. 56. It is "hard to say" if his schizophrenia has improved. Tr. 56. He hears voices, talks to himself, and wants to hurt himself, even when he takes his medication. Tr. 56–57. When he told Dr. Taylor he was depressed and hearing voices, she increased his medication. Tr. 57. Sometimes the medications work, and sometimes they do not. Tr. 57.

The ALJ asked a vocational expert to consider a hypothetical claimant the same age as Hartley and with the following limitations:

> [H]e could lift and carry 10 pounds frequently, 20 pounds occasionally; he could sit, stand, and walk each for six hours in an eight hour workday; he can never climb ropes, ladders, and scaffolds; he can frequently climb ramps and stairs; he can frequently balance, stoop, kneel, crouch, and crawl; he can use his upper extremities in all ways; and he can see, hear, and talk; he needs to avoid extreme temperatures, both hot and cold, humidity, dust, odors, fumes, and concentrated exposure to hazards; the job should be a simple one to three step job.

Tr. 66.

The vocational expert testified as follows. The hypothetical claimant could not perform Hartley's past work but could work as a cashier, ticket taker, and ticket seller. Tr. 66–67. He could not maintain competitive employment if he could sit and stand for less than two hours, could not carry two pounds, or would miss more than four days of work a month. Tr. 67–68. Inability to perform even a low-stress job or to twist, stoop, crouch, climb stairs, and climb ladders would affect competitive employment. Tr. 68. Wearing a mask would not prevent a person from performing the identified jobs. Tr. 69–70.

# ALJ's Decision

The ALJ issued a decision in October 2014. Tr. 18–39. At step one,[7] she found Hartley has not engaged in substantial gainful activity since his alleged onset date. Tr. 23

At step two, the ALJ found Hartley suffers from severe impairments of asthma, hypertension, and schizophrenia. Tr. 23.

At step three, the ALJ found Hartley has no impairment or combination of impairments that meets or medically equals the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.[8] Tr. 23. She particularly considered listings 3.00 (respiratory system), 4.00 (cardiovascular system), 5.00 (digestive system, and 12.06 (anxiety-related disorders). Tr. 24.

The ALJ considered the "paragraph B"[9] criteria to determine if Hartley's mental impairments meet or equal the criteria of listing 12.06. Tr. 24. She found Hartley has a mild restriction in activities of daily living because he reported he had a driver's license and drove, read the Bible, could do household chores for a short time secondary to breathing problems and leg pain, and had no difficulty caring for his personal needs. Tr. 24. She found he has mild difficulties in social functioning because

---

[7]The Social Security Administration uses a five-step sequential process to decide if a person is disabled, asking whether (1) he is engaged in substantial gainful activity, (2) he has a severe impairment or combination of impairments, (3) the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) he can perform any of his past relevant work given his residual functional capacity ("RFC"), and (5) there are a significant number of jobs in the national economy he can perform given his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[8]Unless otherwise stated, citations are to authority in effect when the ALJ issued the decision.

[9]The criteria in paragraph B are used to assess functional limitations imposed by medically determinable mental impairments. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C).

he reported he could go to Dollar General but not a larger store that requires more walking, did "good" in church but could not sing in the choir, and experienced auditory command hallucinations. Tr. 24. She found he has moderate difficulties maintaining concentration, persistence, and pace because a May 2014 examination showed he had normal mental status; was cooperative; had normal speech, calm affect, stable mood, logical and coherent thought processes, and limited insight and judgment; and had been assigned a GAF scale rating of 51 to 60, which indicated moderate symptoms. Tr. 24. She found he has had no episodes of decompensation of extended duration. Tr. 24. She also considered the "paragraph C"[10] criteria and found he does not meet them. Tr. 25.

The ALJ stated she had considered the entire record and found Hartley has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b)[11] with additional limitations:

> [F]requent climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; never climb ladders, ropes, or scaffolds; avoid concentrated exposure to extreme temperatures (heat and cold), humidity, fumes, odors, dusts, gasses, and poor ventilation, and hazards. The claimant is limited to simple work.

Tr. 25.

The ALJ summarized the evidence. Tr. 26–32. She stated she had found "no cogent reason why this claimant would not be able to sustain work on a full-time basis." Tr. 29. Regarding Hartley's schizophrenia, she stated:

---

[10]Paragraph C lists additional functional criteria for some listings. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(A).

[11]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. " 20 C.F.R. §§ 404.1567(b), 416.967(b).

In terms of the claimant's schizophrenia, the objective medical evidence does not suggest his symptoms are work preclusive. At the time of his onset, there was no evidence of any mental health treatment, at least through 2012. During a February 2012 hospitalization for an asthma exacerbation, the claimant had a normal mood and affect and his behavior was normal (Exhibit 9F). A brief psychological notation in June 2012 from Mar Jaminal M.D., was unremarkable. The claimant's mental status was normal. He was fully oriented to time, person, and place. The claimant's speech was normal, his mood and affect were appropriate, and his insight and judgment were intact (Exhibit 8F). During a November 2012 admission, the claimant's mental state was normal. He had a normal mood and affect and his judgment and thought content were within normal limits (Exhibit 10F). During his December 2012 admission to Baptist for asthma, the claimant was noted [to] not have endorsed auditory command hallucinations by report. During the mental status evaluation, the claimant was not responding to internal stimuli. The claimant's thought processes were within normal limits (Exhibit 13F). The claimant was discharged with a GAF score of 40, which suggests some impairment in reality testing or communication or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. … A later hospitalization for shortness of breath, days later, was very telling of this gentleman's psychosis. There was no evidence of anxiety, depression, or suicidal ideation (Exhibit 15F). After the claimant's April 2013 psychiatric evaluation, the claimant did not continue follow-up care. He was not seen in the clinic until October 2013, suggesting his symptoms are not as severe as alleged. Even more, this mental status evaluation was unremarkable (Exhibit 17F). A more recent May 2014 follow-up revealed a normal mental status. He was cooperative and his speech was normal. The claimant's affect was calm and his mood was stable. The claimant's thought processes were logical and coherent. His insight and judgment w[ere] limited. The claimant was assigned a GAF score of 51 to 60, which indicates some moderate symptoms which cause moderate difficulty in social, occupational, or school functioning. … Clearly, the claimant is doing much better. His mental health treatment has been few and far between and his symptoms are clearly not as severe as alleged. It was noted that the claimant was not taking his medications, but since restarting his medications, he was doing better. I have accounted for any symptoms the claimant may have as a result of his schizoaffective disorder in the above [RFC].

Tr. 30–31.

Regarding Hartley's daily activities, the ALJ explained,

> The claimant engages in a variety of activities that one would not expect from an individual alleging to be disabled. At [the] hearing, the claimant testified that he cooks. He helps to take care of his two grandchildren, ages 4 and 11. The claimant's activities demonstrate[] a much high[er] capacity than he alleges.

Tr. 31.

At steps four and five, the ALJ found Hartley cannot perform his past relevant work[12] but can perform jobs the vocational expert identified (cashier, ticket taker, and ticket seller). Tr. 32–33. She therefore found no disability. Tr. 33.

### Evidence Submitted to the Appeals Council

With his request for review from the Appeals Council, Hartley submitted additional psychiatric records and a letter from Dr. Taylor. Tr. 831–43.

At an office visit in July 2014, Dr. Taylor diagnosed Hartley with schizoaffective disorder and PTSD. Tr. 839. His chief complaint was an allergic reaction to his medication. Tr. 840. He exhibited akathisia (inability to remain in a sitting posture with motor restlessness and muscle quivering), oral-buccal movements, and hand wringing; reported his depression was a seven on a ten-point scale; reported auditory hallucinations but no visual hallucinations; and denied nightmares, flashbacks, or intrusive thoughts related to PTSD. Tr. 840.

A review of systems was positive for shortness of breath, rash, depression, and hallucinations. Tr. 840. A mental status examination showed the following:

> This is a 51 year old black obese male appropriately dressed and groomed, cooperative with the interview[.] He showed me the scars from the healing rash on his chest. Speech was normal. Patient is alert and oriented to person, place[,] and time. His affect was apprehensive. His

---

[12]"Past relevant work is work [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R. §§ 404.1560, 416.960.

> mood was depressed and anxious. Thought process is logical and
> coherent. There are no apparent delusions. He endorses auditory
> hallucinations. Insight and judgment are limited. There are no
> abnormal involuntary movements noted on exam. He has normal muscle
> strength and tone and a steady gait. Psychomotor activity was retarded.
> His suicidality risk was none. His violence risk was none. Thinking was
> not future oriented. Mental attitude was negative.

Tr. 840. Dr. Taylor assigned a GAF scale rating of 51 to 60, adjusted his medication, and opined he was moderately ill and his prognosis was fair. Tr. 841.

At a medication management visit in August 2014, Dr. Taylor diagnosed Hartley with generalized anxiety disorder and insomnia. Tr. 837. His chief complaint was anxiety. Tr. 837. His wife reported he was doing better—"not scratching everywhere, more able to sit still, rash resolved"—but was making mouth movements, wringing his hands, and stuttering. Tr. 837. He sometimes yelled during possible flashbacks and reported hallucinations telling him to hurt others, but he did not act on those thoughts. Tr. 837. He reported improved sleep and denied nightmares. Tr. 837.

A review of systems showed Hartley was positive for shortness of breath, hallucinations, nervousness, and anxiety. Tr. 837. A mental status exam showed the following:

> This is a 51 year old black obese male appropriately dressed and
> groomed, cooperative with the interview. Speech was normal. Patient is
> alert and oriented to person, place[,] and time. His affect was
> apprehensive. His mood was depressed and anxious. Thought process is
> logical and coherent. There are no apparent delusions. He endorses
> auditory hallucinations. He is denying current suicidal ideation,
> homicidal ideation, or visual hallucinations. Insight and judgment are
> limited. There are no abnormal involuntary movements noted on exam.
> He has normal muscle strength and tone and a steady gait. Psychomotor
> activity was retarded. His suicidality risk was none. His violence risk
> was none. Thinking was not future oriented. Mental attitude was
> negative[.]

Tr. 838. Dr. Taylor assigned a GAF scale rating of 51 to 60, adjusted his medication, and opined he was moderately ill and his prognosis was guarded. Tr. 838.

At an office visit in October 2014, Dr. Taylor diagnosed Hartley with PTSD and schizoaffective disorder. Tr. 834. His chief complaint was of a nervous breakdown five nights earlier. Tr. 834. He reported yelling and screaming that he wanted to kill everyone until his wife physically restrained him and prayed over him, after which he calmed down and went to sleep. Tr. 834. He denied current hallucinations and suicidal or homicidal ideation but reported continued sleep problems, anxiety, and paranoia. Tr. 835. He had been taking his medications as prescribed. Tr. 835.

A review of systems showed he was positive for shortness of breath, and a mental status examination showed the following:

> This is a 51 year old black obese male appropriately dressed and groomed, cooperative with the interview. Speech was normal. Patient is alert and oriented to person, place[,] and time. His affect was apprehensive. His mood was depressed and anxious. Thought process is logical and coherent. There are no apparent delusions. He endorses auditory hallucinations. He is denying current suicidal ideation, homicidal ideation, or visual hallucinations. Insight and judgment are limited. There are no abnormal involuntary movements noted on exam. He has normal muscle strength and tone and a steady gait. Psychomotor activity was retarded. His suicidality risk was none. His violence risk was none. Thinking was not future oriented. Mental attitude was negative.

Tr. 835. Dr. Taylor assigned a GAF scale rating of 51 to 60, adjusted his medication, and opined he was moderately ill and his prognosis was guarded. Tr. 835–36.

At an office visit in November 2014, Dr. Taylor diagnosed Hartley with schizoaffective disorder, insomnia, posttraumatic stress disorder, and generalized anxiety disorder. Tr. 831. His wife reported he had had an "episode" two nights earlier, when he awoke crying, screaming, and asking if he had overdosed on medication. Tr. 831. He was confused or disoriented for about 20 minutes but then calmed down and went back to sleep. Tr. 832. She also reported he had experienced

15

increased anxiety (evidenced by wringing his hands, scratching, and pacing), problems sleeping, teeth grinding, and involuntary movements of the mouth and tongue, but did not seem to be responding to internal stimuli. Tr. 832.

A review of symptoms showed Hartley was positive for malaise, fatigue, shortness of breath, and dystonia (abnormal tonicity of a tissue). Tr. 832. A mental status exam showed the following:

> This is a 52 year old black obese male appropriately dressed and groomed, minimally cooperative with the interview. He was quiet and withdrawn and his wife provided most of the history. Speech was soft, monosyllabic ("yes or no"). He often responded b[y] just nodding his head rather than speaking. Patient is alert and oriented to person, place[,] and time. His affect was apprehensive. His mood was depressed and anxious. Thought process is logical and coherent. He is hypervigilant, paranoid (noted to be scanning the windows and doors). He denies auditory hallucinations. He is denying current suicidal ideation, homicidal ideation, or visual hallucinations. Insight and judgment are limited. There are no abnormal involuntary movements noted on exam. He has normal muscle strength and tone and a steady gait. Psychomotor activity was retarded. His suicidality risk was none. His violence risk was none. Thinking was not future oriented. Mental attitude was negative.

Tr. 832. Dr. Taylor assigned a GAF scale rating of 31 to 40, adjusted his medication, and opined his prognosis was guarded. Tr. 832–33.

Dr. Taylor contended the "social security report" contained inaccuracies and omitted some psychiatric records, including records of two previous psychiatric hospital admissions. Tr. 832. She stated she would address the inaccuracies in a letter. Tr. 832. She explained,

> Patient has been experiencing psychiatric symptoms since around 2012 and had 2 inpatient admissions prior to coming here in April 2013. He has been given several psychotropic medication trials and shown only minimal improvement, brief in duration. He has shown several episodes of decompensation while under my care, requiring medication changes (although he has not been re-hospitalized). He has had to stop working, driving, or managing any of his own household/business/financial or

even medical affairs allowing his wife to take over due to the severity of his psychiatric illness. In my professional opinion, this patient is not able to work in any capacity due to his chronic severe psychiatric condition. His prognosis is poor for recovery.

Tr. 833.

In November 2014, Dr. Taylor submitted a two-page letter to the Appeals Council. Tr. 842–43. She explained she had treated Hartley since October 2013 and his psychiatric treatment dates back to at least December 2012 when he was admitted to a hospital for psychosis. Tr. 842. She explained lapses in insurance coverage and transportation issues have caused difficulty complying with prescribed medication and attending appointments, but his wife kept her informed of his condition and Dr. Taylor adjusted his medications over the phone. Tr. 842.

Dr. Taylor opined Hartley's psychosis is "chronic and longstanding in nature," and "characterized by multiple acute exacerbations of his psychosis and depression." Tr. 842. She described two acute exacerbations—the "nervous breakdown" and "episode" described in the October and November treatment notes. Tr. 842–43. She explained:

> Mr. Hartley continues to experience depressive symptoms of sad mood, anhedonia, decreased energy, intermittent thoughts of suicide, flat affect, feelings of guilt and worthlessness (about not being able to work and provide for his family), difficulty thinking and concentrating, alternating psychomotor retardation and agitation, and insomnia. He also continues to experience psychotic symptoms of paranoid delusions and auditory and visual hallucinations. He experiences [PTSD] symptoms related to [a moving vehicle accident] that occurred in September 2011 including intrusive memories, nightmares, emotional withdrawal (avoidant behavior) and hypervigilance.

> Mr. Hartley has been experiencing psychiatric symptoms since around 2012 and had two inpatient admissions prior to coming here in April 2013. He has been given several psychotropic medication trials and shown only minimal improvement, brief in duration. He has shown several episodes of decompensation while under my care, requiring multiple medication changes (although he has not been re-hospitalized).

He has had to stop working, driving, or managing any of his own household/business/financial or even medical affairs allowing his wife to take over due to the severity of his psychiatric illness. His wife supervises him daily and is afraid to leave him alone for safety reasons. She does not allow him to cook for fear of him leaving the stove or oven on, so he is only able to use the microwave. She does not allow him to be alone with their grandchildren because she does not think he can adequately supervise them (due to his labile moods and preoccupation with internal stimuli). In my professional opinion, this patient is not able to work in any capacity due to his chronic severe psychiatric condition. His prognosis is poor for recovery.

Tr. 843.

Hartley's attorney submitted a letter explaining,

As you can see[,] Dr. Taylor has treated Mr. Hartley for his mental impairments since October 2013, over one year prior to the ALJ decision. She has also offered medical opinions applicable to the time period <u>prior</u> to the ALJ decision, thus this [n]ew and material evidence clearly relates to the period on or before the date of the [ALJ] hearing decision. This evidence also reveals that the ALJ's ultimate [RFC] finding and determination as to the severity of Mr. Hartley's mental impairments are now contrary to the weight of the evidence currently of record.

Tr. 282–83 (emphasis in original).

## Appeals Council's Decision

The Appeals Council stated it considered the reasons Hartley disagreed with the ALJ's decision, the medical source statement from Dr. Taylor, and medical evidence dated July 2014 through November 2014. Tr. 2, 6. It explained it considered whether the ALJ's action, findings, or conclusion is contrary to the weight of the evidence of record and found no basis to change the ALJ's decision. Tr. 2, 6.

The Appeals Council also considered evidence dated April 2013 through May 2014 but found the evidence was not new because it was duplicative of evidence already in the record. Tr. 2.

18

The Appeals Council denied Hartley's request for review. Tr. 1–3.

## Analysis

Hartley argues the Appeals Council erred by denying his request for review of the ALJ's decision. Doc. 11 at 6–20. He contends the evidence was new, material, and chronologically relevant, and rendered the ALJ's findings and conclusions contrary to the weight of the evidence. Doc. 11 at 7. He contends the newly submitted evidence renders erroneous the findings he can perform simple work, he has only mild restrictions of activities of daily living, he has experienced no episodes of decompensation, and his lack of mental health treatment shows his symptoms are not as severe as alleged. Doc. 11 at 7–19. The Commissioner responds that, even with the newly submitted evidence, substantial evidence supports the ALJ's decision. Doc. 13 at 12–22.[13]

The Social Security Administration uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of a denial. *Bowen v. City of New York*, 476 U.S. 467, 471–72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900−404.906, 416.1400−416.1406. If the claimant is dissatisfied with the initial determination, he may ask for reconsideration. 20 C.F.R. §§ 404.907−404.918, 416.1407–416.1422. If he is dissatisfied with the reconsideration determination, he may ask for a hearing before an ALJ. 20 C.F.R. §§ 404.929−404.943, 416.1429–416.1443. If he is dissatisfied with the ALJ's decision, he may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967−404.982, 416.1467–416.1482. If the Appeals Council denies review, he may file an action in federal district court. 20 C.F.R. §§ 404.981, 416.1481.

---

[13]Hartley does not contest the Appeals Council's finding that the medical records dated April 19, 2013, to May 14, 2014, were not new. *See generally* Doc. 11.

With limited exceptions, a claimant may present new evidence at each stage of the administrative process, including before the Appeals Council. 20 C.F.R. §§ 404.900(b), 416.1400(b). While the Appeals Council may decline to review the ALJ's denial of benefits, it "must consider new, material, and chronologically relevant evidence" a claimant submits. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007). The Appeals Council will review a case if (1) it appears the ALJ abused her discretion; (2) there is an error of law; (3) substantial evidence does not support the ALJ's action, findings, or conclusions; (4) there is a broad policy or procedural issue that may affect the public interest; or (5) new, material, and chronologically relevant evidence renders the ALJ's action, findings, or conclusion contrary to the weight of the evidence currently of record. 20 C.F.R. §§ 404.970, 416.1470. The Appeals Council need not provide a detailed explanation for why it denied review. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 783–85 (11th Cir. 2014).

A court may review a denial of review by the Appeals Council. *Ingram*, 496 F.3d at 1262. If a claimant presents new evidence to the Appeals Council, "a reviewing court must consider whether the new evidence renders the denial of benefits erroneous." *Id.* If a claimant argues new evidence to the Appeals Council renders the ALJ's decision unsupported by substantial evidence and the Appeals Council erred by denying review, a reviewing court must decide if substantial evidence supports the final decision in view of the entire record. *Id.* at 1266–67.

In contending the newly submitted evidence renders erroneous the ALJ's RFC finding that he could perform simple work without further mental limitations, Hartley points out Dr. Taylor is a treating physician and her opinions are detailed, non-conclusory, and substantial. Doc. 11 at 14–18. The Commissioner responds the new evidence does not render the ALJ's RFC findings erroneous because the treatment records are similar to those already in the record, the examination findings in the November treatment record are not chronologically relevant, Dr. Taylor's

opinion that Hartley cannot work is on an issue reserved to the Commissioner and entitled to no special significance, and Dr. Taylor did not opine Hartley had any particular additional limitation. Doc. 13 at 12–16.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A social-security claimant must prove he is disabled. 20 C.F.R. §§ 404.1512, 416.912.

A claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The Social Security Administration uses the RFC at step four to decide if he can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy he can perform. 20 C.F.R. §§ 404.1545(a)(5), 416.945(a)(5).

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of … impairment(s), including … symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and … physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Regardless of its source, the Social Security Administration will evaluate every medical opinion it receives. 20 C.F.R. §§ 404.1527(c), 416.927(c).

The Social Security Administration generally will give more weight to the medical opinions of treating sources[14] because they "are likely to be the medical

---

[14]A treating source is a physician, psychologist, or other acceptable medical source who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with

professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If a treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is entitled to controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ need not give more weight to a treating source's opinion if there is good cause to do otherwise and substantial evidence supports the good cause. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if the evidence did not bolster the opinion, the evidence supported a contrary finding, or the opinion was conclusory or inconsistent with the treating source's own medical records. *Id.* at 1240−41.

Certain issues, such as whether a claimant is disabled, unable to work, or meets a listing, are issues reserved to the Commissioner because they are dispositive. 20 C.F.R. §§ 404.1527(d), 416.927(d). Opinions on those issues are not "medical opinions" within the meaning of the regulations and have no special significance but should not be ignored; an ALJ "must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." 20 C.F.R. §§ 404.1527(d), 416.927(d); Social Security Ruling (SSR) 96-5p, 1996 WL 374183, at *2−3 (Jul. 2, 1996).

Though Dr. Taylor did not identify any particular additional limitation and some of the new records contain notations similar to those before the ALJ, the new evidence (even without the November 2014 treatment notes) undermines the ALJ's RFC analysis, renders her findings contrary to the weight of the evidence, and leaves

---

accepted medical practice for the treatment or evaluation required for the medical condition. 20 C.F.R. §§ 404.1502, 416.902. An ALJ "may consider an acceptable medical source who has treated or evaluated [a claimant] only a few times" a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)." *Id.*

them unsupported by substantial evidence.

The ALJ found Hartley's symptoms are not as severe as alleged because he failed to follow up after his April 2013 evaluation and his treatment has been "few and far between," but the new evidence showed he had more appointments before the ALJ's decision, and Dr. Taylor explained he could not attend appointments due to insurance and transportation problems, she learned of his problems, and she adjusted his medications by telephone. Tr. 842. The ALJ pointed to "normal" mental status exams as proof Hartley was "doing much better," but the new evidence provides additional longitudinal information about the severity of his condition (including details of a "breakdown" and involuntary movements), and Dr. Taylor explained he continues to experience sad mood, anhedonia (absence of pleasure), decreased energy, thoughts of suicide, flat affect, feelings of guilt and worthlessness, difficulty thinking and concentrating, alternating psychomotor retardation and agitation, insomnia, paranoid delusions, auditory and visual hallucinations, intrusive memories, nightmares, emotional withdrawal, and hypervigilance. Tr. 843. The ALJ stated Hartley was "doing better" since restarting his medications, but Dr. Taylor explained he has shown only brief, minimal improvement with psychotropic medication trials and has required multiple medication changes. Tr. 843. The ALJ observed Hartley's daily activities of taking care of his grandchildren and cooking are inconsistent with his allegations of disabling symptoms, but Dr. Taylor explained his wife does not allow him to use the oven or stove for fear he will leave them on, does not leave him alone with the grandchildren because his labile moods and preoccupation with internal stimuli prevent him from adequately supervising them, and has taken over his household, business, financial, and medical affairs. Tr. 843.

The only remaining rationale for the ALJ's mental RFC findings is the normal psychiatric notations in Hartley's 2012 asthma-treatment records. Many of those records predate the mental-impairment diagnoses he added, *see* Tr. 256, 264, and they are not from mental-health specialists and provide little detail. In light of the

new treatment records and opinion evidence from a mental-health treating source providing additional longitudinal information about Hartley's mental condition, the 2012 asthma-treatment records are not substantial evidence to support the ALJ's mental RFC findings.

The evidence submitted to the Appeals Council undermines the ALJ's rationale for the mental RFC finding, renders it contrary to the weight of the evidence, and leaves it unsupported by substantial evidence. Reversal and remand for consideration of the new evidence are warranted.[15]

## Conclusion

The Court reverses the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3) and remands the case to the Commissioner with directions to reevaluate Hartley's mental RFC in light of the newly submitted evidence, reevaluate any other finding affected by the newly submitted evidence, and take any other necessary action.

---

[15]Hartley contends the newly submitted evidence also renders erroneous the ALJ's "paragraph B" findings that he has only mild limitations in activities of daily living and has experienced no episodes of decompensation of extended duration. Because reversal and remand are warranted for reconsideration of the mental RFC findings, the Court need not address those arguments. On remand, the Commissioner may reevaluate those findings.

Though Dr. Taylor's statement that Hartley cannot work is an opinion on an issue reserved to the Commissioner and is entitled to no special significance, it is entitled to consideration to determine the extent to which the record supports it. *See* SSR 96-5p, at *2–3. On remand, the ALJ may consider it.

The Court **directs** the clerk to enter judgment in favor of Hartley and close the file.

**Ordered** in Jacksonville, Florida, on September 14, 2017.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:     Counsel of Record